ERNEST M. DELAHOYDE

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 22, 1904.*

1. CRIMINAL LAW—*reasonable doubt of guilt must arise from the whole evidence.* The reasonable doubt of guilt which will justify the jury in finding the accused not guilty must be based upon the whole of the evidence, and not upon any particular fact.

2. SAME—*knowledge that goods were stolen may be proved by circumstances.* In a prosecution for receiving stolen goods the fact that the accused knew the goods to have been stolen may be shown by circumstances.

3. SAME—*when assumption of fact in instruction is not harmful.* Assumption in an instruction, in a prosecution for receiving stolen goods, that the accused received the goods is harmless, where that fact is abundantly proven and practically conceded by the accused.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. AXEL CHYTRAUS, Judge, presiding.

BLAKE & FEELY, for plaintiff in error.

H. J. HAMLIN, Attorney General, and CHARLES S. DE-NEEN, State's Attorney,. (FREDERICK L. FAKE, Jr., of counsel,) for the People.

Mr. CHIEF JUSTICE RICKS delivered the opinion of the court:

On October 21, 1903, the grand jury of Cook county returned an indictment in ten counts against Ernest M. Delahoyde, the plaintiff in error, and Edward Dipple and Blaine Roth. The first eight counts of the indictment charge the defendants with larceny and embezzlement, and with aiding, abetting and assisting in the commission of said crime. The ninth count charges the same defendants with the larceny of certain goods. The tenth count charges that the said defendants did buy, receive and aid in concealing certain property

therein specifically enumerated, of Rogers, Thurman & Co., knowing the said goods to have been feloniously stolen, etc. At the November term of the criminal court of Cook county the plaintiff in error was tried, the chief witnesses against him being his co-defendants, Dipple and Roth. The jury found the plaintiff in error guilty of receiving stolen property knowing the same to have been stolen, in manner and form as charged in the indictment, and fixing the value of the property so stolen and received at the sum of $100. The plaintiff in error successively asked and was refused an instruction directing the jury to find him not guilty, a motion for a new trial and arrest of judgment, and was at the conclusion sentenced to the Illinois State Reformatory at Pontiac, and on a refusal of the court to set aside said sentence the plaintiff in error sued out this writ of error.

Fifty-five assignments of error are made, but those chiefly relied upon are the insufficiency of the testimony to sustain the verdict, the reception and exclusion of testimony and the giving and refusal of instructions.

A brief summary of the facts necessary to a consideration of this case is as follows: In the summer of 1903 the corporation of Rogers, Thurman & Co. was engaged in the wholesale jewelry business in Chicago, Charles F. Elmore being the manager of the firm. Up to October, 1903, Edward Dipple was employed by the firm as an office boy. During the same summer Mrs. Sarah Paul and her daughter, Hattie Paul, resided at 2330 State street. Hattie Paul had a brother by the name of William, or, as he was called, Willie. About the latter part of April, 1903, the plaintiff in error, E. H. Miller and Blaine Roth formed a co-partnership under the name of Delahoyde, Miller & Roth, for the purpose of manufacturing and selling jewelry and engraving and selling glassware. In their business they traveled from place to place vending their wares. The partnership continued until about the 4th of July, 1903, when it was dissolved, the venture having proved unsuccessful, and the plaintiff in

error continued in the glass engraving business for himself. It is said by Elmore, manager for Rogers, Thurman & Co., that during the summer of 1903 he missed large quantities of goods, amounting in all to nearly $300. In September, 1903, he received a letter from plaintiff in error casting suspicion upon Miller and Roth, the former partners of the plaintiff in error. Several letters were exchanged between Elmore and the plaintiff in error, and as a result Elmore had an interview with Edward Dipple, one of the parties indicted with plaintiff in error, in which conversation Dipple admitted having taken the goods that had been missed, stating that Roth and Delahoyde had told him to take the goods and give them to them. After this conversation Dipple was arrested and an officer was sent for Roth, who was at Danville. After an interview with Roth an officer was dispatched to Terre Haute, Ind., for Delahoyde, the plaintiff in error. After the arrest of Roth a portion of the goods that had been missed were recovered.

Delahoyde, the plaintiff in error, is said to have been a man about thirty years of age and whose career had been somewhat varied. For a number of years he had worked as a wire artist and glass engraver, and had been purchasing goods of Rogers, Thurman & Co. Blaine Roth, a co-defendant, was about nineteen years of age, and for six years had been in the employ of Rogers, Thurman & Co., starting as an office boy and being advanced to the position of confidential clerk. Edward Dipple, the other co-defendant, was about seventeen years old, and worked as office boy for Rogers, Thurman & Co., his position with that firm having been procured by Roth. E. H. Miller was about thirty-one years of age, and had been a dentist, but on account of failing eyesight had to give up that profession. He and Roth were planning to embark in the wire business, when plaintiff in error, who had been introduced to Miller by Roth, suggested that he be taken into the venture as he had experience on the road, and urged that he be taken into the proposed partnership as a

glass engraver, and that the proceeds of the partnership be divided equally among the three. The conclusion of the matter was the formation of the partnership between the three, Miller advancing the capital invested, being about $400.

Miller testified that before going out on the road they purchased from Rogers, Thurman & Co. about $125 worth of goods; that about the 10th of April they had a conversation at Roth's house relative to getting other goods than what they had already received; that Delahoyde asked Roth how much stuff they had; that Roth showed him, stating it was goods left over out of material Elmore had given him to bring home to work up, and Delahoyde stated: "You are a damn fool; if I had been working there as long as you have I would have as much stuff in this house as Elmore has down in his store;" that witness stated that they wanted more stuff, and Delahoyde said, "What is the use of buying all this stuff when we can get it in an easier way?" and on being asked how, he replied, "Well, we can get somebody down at Elmore's to get it for us;" that witness replied that that would not be right—that they had better pay for what they got. Miller further stated that he was the only one that put any money into the business; that Delahoyde further said: "We can get Eddie; Eddie works down there and it is easy for him to get out stuff, and he can carry all the stuff we want; there is no need of us buying all that stuff; we better put the money into glass; there is more money in glassware than there is in jewelry." He further stated that the "Eddie" referred to was Edward Dipple. Miller further stated that they had another conversation the next day, or the day following, at Roth's house, and Delahoyde said: "There is no use in going down and paying out any more money; there is no need in getting beat of our money if we can get it in an easier way; I know Eddie will get it; we will pay Eddie for getting it and he will get anything we want; we have got enough of stuff now." Miller said that he and Roth were both opposed to getting the stuff

in that way; that Roth said: "No, it is not right to get it that way; Mr. Elmore has always treated me right and I don't want to do anything like that." Miller further said that he was never present at Rogers, Thurman & Co.'s when any goods were got that were not paid for; that goods were received while they were on the road; that they got a parcel at Quincy but that he thought it came in Roth's name; that they also got a package at Springfield; that one time Delahoyde got a package, saying he got it at Mrs. Paul's house.

Edward Dipple testified that he had a conversation with Roth and Delahoyde about three days before they started on the road, in the latter part of April or the first of May. He said: "I talked with Blaine Roth. Delahoyde was standing about five or six feet away, within the sound of my voice. Blaine asked me to get some shells. He said: 'Will you get us some shells—some stuff—and we will pay you for them? Will you get us some shells out of the store? We will pay you for them.' He did not mention what articles. I said, 'All right.' Up to that time I had not stolen anything from Rogers, Thurman & Co." On being asked what, if anything, he took and gave to either Delahoyde, Blaine Roth, Hattie Paul or her brother, he said: "The first package was about the beginning of May," and describing, in a general way, what was in the package. "I took about four packages altogether. This first package was taken about the first of May, and the second about a week. I was going home and met Hattie's brother and gave it to him and told him to take it up in the house. I didn't tell Elmore or anybody else about taking the stuff. That is the stuff I stole. I had no arrangement with Blaine Roth and Delahoyde as to what I was to get out of that stuff that was taken." On being asked what they told him to do with what he got, he said: "They told me to bring it up to Paul's house." Witness further said: "I gave this first lot of stuff that I took to Hattie Paul's brother, Will, and he brought it to the house. I took the next lot about the third week in May, (describing what it contained.) The

third package was about the middle of June, (describing its contents.) The fourth time I took anything from Rogers, Thurman & Co. was about the latter part of June," (describing the contents of the package.) And continuing, he said: "I didn't have any arrangement with Blaine Roth or Delahoyde in reference to the money I should receive for these. I received in all about $12 or $15 from them for these at different times. I received it from Hattie, I think, or Blaine. I think it came through the mail to Hattie and she gave it to me."

Hattie Paul testified: "I seen the contents of one of the packages that my brother got. It was a lot of shells and a little wire; some little packages and some other kinds of shells and some gold stones. I received four packages in that way at four different times. I received the first one the last part of May, the second in June some time, the third I got in June again, and the fourth, that was in July. That is all of them. I gave Delahoyde one. I conversed with Delahoyde when he came in. He said they would not let Blaine come. I asked him what he came for. * * * He said he came to get a package, and I said did Blaine send him, and he said yes." She further testified that the other packages she received she sent to Blaine Roth by express.

Blaine Roth testified: "I had a conversation with Delahoyde about stealing goods, before I left Rogers, Thurman & Co.'s employ. He used to come in the store every week to buy goods, and he asked me if there was any way I could get him goods out of the store. I said no. I was working there at the time and never thought of such a thing. He said: 'There is a chance for you to make quite a bunch of money; I will take all you get and get rid of them; if you get the goods I will see that I get rid of them, and you will make a bunch of money out of it.' I said no. I never stole any of their property during the time I was in the employ of Rogers, Thurman & Co. I had a talk with Delahoyde nearly every day from about the 25th to the 28th of April of this

year with reference to getting goods. He said, "There is a boy working down at Rogers, Thurman & Co. that you can approach and get goods out of there.' He says: 'Now, you know him; you got him the job; you go down and speak to him and tell him we can use all the goods he gets, and we will pay him for what he gets.' I did not want to do it for about a week, and then he kept at me so much I gave in and went down and told the boy. I went with Ernest Delahoyde. The boy I mean was Eddie Dipple. When I was talking with Dipple, Delahoyde was within six feet of me; just exactly six feet,—the length of a show-case. I told Eddie, 'If you can get any goods out of here, Eddie, we can use them; we are going on the road and use all the goods you get; if you get them we will pay you for them.' Eddie says, 'I can get the goods out.' After that I says, 'If you get the goods, you take them to Miss Paul's house and leave them in a bundle, and I will send for them and nobody will know what they are,' which he did. After that I had a talk with Delahoyde about the talk I had with Eddie. I told him what I said. Delahoyde was within hearing of this conversation if he wanted to hear. After I left Rogers, Thurman & Co. that morning I told him I spoke to him, and he says, 'I heard you talking.' He says, 'That is all right; we can use anything he gets out of there.' I received property after that. The first package I received was at Quincy, Illinois. The first one was the last part of May, received at Quincy, Illinois. I received about four packages altogether. * * * The second package was brought to me by Ernest Delahoyde on the 15th day of June, and was received at Springfield, Illinois. When he brought it to me he says: 'I called at Hattie's house and got the package; it was out there for us.' * * * After he came back with the package he said, "This is the biggest package we have gotten so far.' * * * We dissolved partnership one week after the 4th of July, or a month at the outside. Delahoyde said he didn't see any way to make any money the way he was going along there, and thought

best to dissolve. We received the last package after we dissolved partnership and the other three before we dissolved partnership. * * * The money paid to Edward Dipple amounted in the book to $12. We kept a list of all expenses. Delahoyde paid the most of it. I didn't pay a cent, because I didn't have any."

We deem it unnecesary to go into further detail in regard to this testimony. We have carefully examined the record before us, and it is replete with evidence which we think, to the unprejudiced mind, conclusively shows plaintiff in error to have been guilty of the crime charged in the tenth count of the indictment, on which he was convicted. We are unable to adopt the contention of counsel for plaintiff in error that the evidence does not sufficiently show that plaintiff in error received the goods actually taken from Rogers, Thurman & Co. To our minds the evidence conclusively shows that plaintiff in error was the instigator of a scheme to steal property from Rogers, Thurman & Co.; that Edward Dipple was induced to take property from said firm; that the identical packages of goods taken by Dipple were delivered to Hattie Paul or her brother; that at least one of these packages was delivered to plaintiff in error in person and others were received by him through the agency of Roth and the express company. The evidence is also ample to support the jury's finding as to the value of the property. We think the evidence in this case brings it well within the rule laid down by the cases invoked by the counsel for plaintiff in error to support their contention that in order to sustain a conviction in cases of this character it is necessary to prove that the property described in the indictment has in fact been stolen, that the accused received it with such knowledge and that the jury must find the value of the property so stolen.

Counsel for plaintiff in error contend that the court improperly refused admission in evidence of a certain bill purporting to show the sale of goods to plaintiff in error in September, 1903, on the ground that it was not cross-exam-

ination. This was after the dissolution of the partnership between Miller, Roth and Delahoyde,—after the goods testified to as having been stolen were taken. Besides, it was nowhere contended that plaintiff in error had any of the stolen goods at the time of his arrest or afterwards, so the testimony offered could have no bearing upon the issue being tried and its exclusion was proper.

Counsel for plaintiff in error next contend that there was error in the court's refusal to permit them to elicit from the witness Miller, in their cross-examination of him, all of certain conversations had with plaintiff in error about which the witness testified. All that the matter sought to have been brought out tended to show was the attitude assumed by Miller and Roth when the wrongful propositions of plaintiff in error were made to them. We do not see how the matters sought could have any bearing upon the defendant's guilt, and think he was not prejudiced by the action of the court.

It is also objected that Hattie Paul was allowed to state that her brother got the packages she received from him from Eddie Dipple, and that she further testified that her brother said he got the packages from Edward Dipple. It is contended that the first answer was a conclusion, as the witness had no personal knowledge of the fact testified about, and that the second was the giving of hearsay testimony. On this point the record is as follows:

Q. "And those packages he got from Eddie Dipple?

A. "Yes, sir. (Objected to by counsel for the plaintiff in error.)

Counsel for the People: "If you know—do you know? (Objected to by counsel for the plaintiff in error; objection overruled.)

Counsel for the People: "Do you know where your brother got them from?

A. "He said he got them from Eddie Dipple."

To this last answer no objection appears. It will thus be seen that the criticism of counsel for plaintiff in error is un-

tenable. The first question was leading, but it is not objected to on that ground; and even if it were, the error is only slight. The contention as to the second question cannot now be insisted upon, since the answer of the witness was not directly responsive and was not objected to.

It is next objected that a certain exhibit was wrongfully admitted in evidence. The exhibit referred to was what was claimed to be a sheet from the original account book kept by the firm of which plaintiff in error was a member, and the particular item was: "Sent to Chicago, to Harry, $1.50." The criticism made is, that the proper proof as to the book account was not made. Plaintiff in error, however, afterwards testified to the same entry and recognized at least a part of the writing as being his own. The witness who produced the sheet containing the item testified about, stated that the money paid to Edward Dipple "amounted in the book to $12;" that they kept a list of all expenses; that the slip produced was a part of the book; that the plaintiff in error kept the book; that the entry was in his handwriting, and that he could find no more of the book; that the name "Harry" referred to Edward Dipple; that the name Harry was used so it would not be known who was meant. We think, under the circumstances shown, the admission of this sheet was not improper.

It is further insisted that it was error for the witness Roth to testify that "he knew it was there," referring to Delahoyde's knowledge of the package which he went to Hattie Paul's house for, in Chicago, it being insisted that this was but the expression of a conclusion. It is established that Delahoyde did go to Hattie Paul's house and get this package, so we cannot say that the assertion of the witness Roth was merely a conclusion.

Some other objections are urged as to the admission of certain evidence, but we regard them as of minor importance and take the view that no harmful errors were committed in such admissions.

Objection is next made as to the giving and refusal of certain instructions, the first objection being the refusal to direct the jury to find the defendant not guilty. This assignment needs no further consideration, as we have already expressed the opinion that the record is sufficient to support the conviction.

The second instruction given for the People is objected to, and it is claimed "that it should have told the jury that it was necessary, in order to convict Delahoyde under the tenth count, that he should have received the property, or some part of it, described in the indictment." The jury were told this in other instructions, and we think they could not have been misled by not having it also included in this instruction.

It is complained that instruction 4 given for the People "leaves the jury free to convict Delahoyde under the tenth count of the indictment, but it does not tell the jury what is necessary for conviction under that count." As we read this instruction it is plain that it could not be construed as in any way applying to the tenth count of the indictment, and it did inform the jury what was necessary in order for them to find defendant guilty under the embezzlement counts, charging aiding and abetting, to which it did apply. In this instruction the jury are told: "If you believe, beyond a reasonable doubt, that the defendant Ernest M. Delahoyde advised or encouraged Blaine Roth to procure Eddie Dipple to steal or embezzle in manner and form as charged in the indictment, and that Eddie Dipple did steal as a result of Roth's so procuring, then in such case you should find defendant Ernest M. Delahoyde guilty."

Of the twelfth instruction given for the People it is said: "The jury are told that the reasonable doubt, under the influence of which they should acquit, must be as to the guilt of the accused on the whole evidence, whereas they should have been told that if they have a reasonable doubt as to the proof on any material point in the case, then it would be the duty of the jury to acquit the defendant." This criticism is not

supported by the rule heretofore laid down by this court. This court has held in a number of cases that the reasonable doubt the jury is permitted to entertain must be in regard to the guilt of the accused on the whole evidence, and not on any particular fact in the case. *Mullins* v. *People,* 110 Ill. 42; *Davis* v. *People,* 114 id. 86.

Instruction 15 given for the People is objected to by the plaintiff in error because it does not tell the jury that they must be satisfied that defendant committed the crime charged in the indictment. The instruction does tell the jury that they must be satisfied of the guilt of the defendant beyond a reasonable doubt in order to convict him; and in instruction 5 given for the defendant the jury were told that if they believed, from the evidence, that the defendant took no part in the crime charged in the indictment he should be acquitted. This instruction is also objected to upon the ground that it does not tell the jury that in order to find a conviction it is necessary that the circumstances be such as to so convince the jury that they would have no reasonable doubt upon any of the points necessary to be proved. Upon the question of reasonable doubt the jury were amply and fully instructed in numerous instructions given both for the People and the defendant, and what has already been said as to instruction 12 might be reiterated here as to the objection urged.

Objection is also made to instruction 16 given for the People. We have examined that instruction and think it was not improper. The first objection made to this instruction is, that it told the jury that in order to convict one of receiving stolen goods, the fact that the person who received the stolen goods knew the same to have been stolen might be proved by circumstances. This court has held this to be the law in *Huggins* v. *People,* 135 Ill. 243, and the instruction was not erroneous in this regard. It is next objected to this instruction that it assumes plaintiff in error to have received the goods in question. This criticism is perhaps true, but under the proof it could do no harm to plaintiff in error, for the re-

ception of the goods by him, in our judgment, was abundantly proven, and, we think, practically conceded by plaintiff in error.

As to the complaint made because of the refusal of certain instructions offered by the plaintiff in error, we think it is without merit, as the substance of those instructions was contained in others given.

Upon a review of the whole record we are satisfied that no such error has intervened as would warrant a reversal.

The judgment of the criminal court of Cook county is affirmed.                                    *Judgment affirmed.*